

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

## No. 02-19-00277-CV
_____

J.M., Appellant

V.

C.M., Appellee

_____

On Appeal from the 211th District Court
Denton County, Texas
Trial Court No. 16-09602-211

_____

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

## I. Introduction

Appellee C.M., who had two children from a prior marriage, and Appellant J.M. met on match.com in 2005. They took out a mortgage and bought a house (Kirkhaven), taking title in both of their names, and had two children together before they married in November 2009.[1] They then had two more children together. During this time, they had two vehicles to transport the family of eight.

J.M. inherited $2.25 million when his mother died in July 2013.[2] He used some of his inheritance to pay off the Kirkhaven mortgage in 2014, and he used some of it to build the family's new $995,000 dream home (Cedar) in February 2016, when

---

[1]Property owned or claimed before marriage is separate property. Tex. Fam. Code Ann. § 3.001. Whether property is separate or community is usually determined by its character at inception, i.e., when the party first has a claim to the property. *Loaiza v. Loaiza*, 130 S.W.3d 894, 908 (Tex. App.—Fort Worth 2004, no pet.) (referencing *Barnett v. Barnett*, 67 S.W.3d 107, 111 (Tex. 2001)). With regard to the division of the community estate, the trial court "is to do complete equity as between the husband and wife and the children, having due regard to all obligations of the spouses and to the probable future necessities of all concerned." *Bradshaw v. Bradshaw*, 555 S.W.3d 539, 543 (Tex. 2018).

[2]Property acquired after marriage by devise or descent is separate property. Tex. Fam. Code Ann. § 3.001. *See also id.* §§ 3.002–.003 (providing that all property acquired by either spouse during the marriage is presumed to be community property and that clear and convincing evidence is required to defeat this presumption); *Pearson v. Fillingim*, 332 S.W.3d 361, 364 (Tex. 2011) (stating that the burden is placed on the party claiming separate property to prove that the property is not community).

neither he nor C.M. had a job.[3]  J.M. also took the family on a few vacations and to dinner at least once a week, and he bought a $46,000 timeshare in New York City.  He seeded each of the children's college savings accounts with up to $20,000 each.  And the parties acquired two more vehicles.  In addition to travel and other purchases such as home furnishings, J.M. described their spending as "just frivolous things, clothing, just paying retail for too much."  J.M., who worked in information technology, found another job in September 2016.[4]

In November 2016, C.M. filed for divorce.  At that time, J.M. had less than $300,000 of his inheritance left.  C.M. and the children[5] continued to live in Cedar while J.M. moved back into Kirkhaven.  J.M. spent more than $10,000 to refurnish Kirkhaven and bought the children new iPads.

---

[3]C.M. became a stay-at-home mom after she lost her job in 2015.  J.M. was laid off in December 2015 just after having suffered a heart attack.

[4]Because of the nature of the industry in which he worked, J.M. had been laid off in 2002, 2013, 2015, 2017, and 2018, but when he was employed, he made around $100,000 a year.  At a February 7, 2020 hearing, J.M. stated that he had not had a full-time job since December 2018 and had been living off of "odd-end jobs" and borrowing money.

[5]J.M. and C.M.'s 11-year-old child suffered from ADHD, oppositional defiance disorder, and bipolar disorder, and he was obsessed with the divorce.  At the time of the trial, he remained in a residential treatment center at the State's expense.

J.M. lost his job in May 2017 but found another one. After three years of increasingly contentious divorce proceedings[6] during which the parties racked up thousands of dollars in attorney's fees,[7] the trial court signed a final decree following a multi-day bench trial. The trial court dissolved the marriage on the ground of insupportability, and although it appointed J.M. and C.M. as the children's joint managing conservators, it limited J.M.'s periods of possession based on his "history of erratic behavioral issues, including anger outbursts, blaming others, acting in a manner that causes issues for him with law enforcement, disregard of rules set by the court, alcohol use, and sexual acting out." J.M. was ordered to pay C.M. $2,800 per month in child support, with "step-down" decreases of $400 as each child reached 18, graduated from high school, or otherwise had disabilities removed. *See* Tex. Fam. Code Ann. § 154.127.

The trial court also made several findings pertinent to this appeal. Among other things, the trial court found that J.M. had owned 57.72% of Kirkhaven as his separate property, that C.M. had owned 42.74% of Kirkhaven as her separate

---

[6]After the divorce was filed, the police were called four or five times, and at one point, both parties had criminal charges pending against them.

[7]Notwithstanding a thorough cross-examination of his expenses during the first days of trial, J.M. continued his spending pattern and agreed during trial that if he had not spent so much on dining out, he might have been able to pay his court-ordered child support. On the last day of trial, J.M. testified that—not counting the money tied up in Kirkhaven and Cedar—he had only $200 left of his $2.25 million inheritance.

4

property,[8] and that J.M.'s separate estate had contributed $205,631.07 to pay off the Kirkhaven mortgage, entitling J.M.'s separate estate to equitable reimbursement of that amount from C.M.'s separate estate. *See id.* § 3.402(b) ("The court shall resolve a claim for reimbursement by using equitable principles, including the principle that claims for reimbursement may be offset against each other if the court determines it to be appropriate."), § 7.007 (stating that in a divorce, the trial court shall determine the spouses' rights in a claim for reimbursement and apply equitable principles to (1) determine whether to recognize the claim after taking into account all the relative circumstances of the spouses and (2) order a division of the claim for reimbursement, if appropriate, in a manner that the court considers just and right, having due regard for the rights of each party and any children of the marriage).

The trial court also found that J.M. had intended a gift of an undivided one-half interest in Cedar when he included C.M. on the deed at the time of closing[9] and testified that he had intended for her to own Cedar upon his death.[10]

---

[8]We note that these percentages total 100.46%. The trial court's judgment, in contrast, allocated 42.274% to C.M. and 57.726% to J.M. Accordingly, we conclude that the trial court's findings of fact contain a typo.

[9]A presumption of gift arises when a spouse uses separate property consideration to pay for land acquired during the marriage and takes title to the land in the name of both spouses. *Cockerham v. Cockerham*, 527 S.W.2d 162, 168 (Tex. 1975). However, this presumption can be rebutted by evidence clearly establishing that there was no intention to make a gift. *Id.* A gift is a voluntary transfer of property to another made gratuitously and without consideration, and three elements are required to establish a gift's existence: (1) intent to make a gift; (2) delivery of the property; and (3) acceptance of the property. *Williams v. Williams*, No. 02-08-00033-

In the divorce decree, the trial court appointed a receiver to sell both homes.[11] C.M. was given the right to exclusive use and possession of Cedar until closing, while J.M. was given the right to exclusive use and possession of Kirkhaven until closing.

CV, 2008 WL 5194227, at *4 (Tex. App.—Fort Worth Dec. 11, 2008, no pet.) (mem. op.).

[10]J.M. stated, "I put [C.M.] on the deed so in case I died it would be -- very quickly be her house, but other than that, that's the only reason . . . [; i]t would be a very easy way for her to conduct anything." He elaborated, stating, "I would like that if I had died all of the sudden that she would be taken care of." J.M.'s gangrenous gall bladder was removed in 2006, and he suffered a heart attack in 2011 and another in 2015. He also suffered from post-traumatic stress disorder, major depression disorder, and alcoholism.

[11]In the decree, with regard to the community estate, the trial court awarded to each party the furniture, furnishings, fixtures, goods, art, collectibles, appliances, and equipment in each's possession except as otherwise specifically itemized. It awarded to C.M. a leather sectional sofa; half of the children's video game consoles and video games; half of the Christmas decorations and lights; half of the family photos; all iPhones, iPads, or other electronic devices for which she paid the monthly charges; the refrigerator and freezer in her possession; all of the children's furniture; the bedroom furniture in her possession; iMac and MSI computers; and one bike and booster seat per child, with the excess bikes and booster seats going to J.M. The trial court also awarded to C.M. twelve boxes containing her personal items that were located at Kirkhaven and a 2011 Toyota Siena worth $7,800, in addition to funds in her possession or subject to her sole control. The only separate property interest confirmed for C.M. was 50% of the proceeds of Cedar and 42.274% of the proceeds of Kirkhaven upon their eventual sale.

J.M. was awarded the other half of the children's video game consoles and video games; three PC Clones; the other half of the Christmas decorations and lights; the other half of the family photos; the excess bikes and booster seats; all iPhones, iPads, or other electronic devices for which he paid the monthly charges; a 2006 Audi acquired during the marriage; a Nissan van acquired during the marriage; the funds, clothing, jewelry, and other personal effects in his possession or subject to his sole control; the funds in any retirement or brokerage accounts related to his employment or in his name; and the New York time share. The trial court confirmed the following

6

During the pendency of this appeal, J.M. received $199,645.26[12] in reimbursement after the November 5, 2019 sale of Kirkhaven, but by the time of a February 7, 2020 trial court hearing, he had spent most of this amount and testified that he was pursuing Social Security Insurance disability because of his mental problems.

In two issues, J.M. complains that the trial court abused its discretion by mischaracterizing Cedar[13] and by holding that he made a gift of half of it to C.M.

---

as J.M.'s separate property: a 2009 Mercedes ML550 and all jewelry that he had inherited from his mother; a Hyundai van; two televisions, purses, furs, rugs, and various other furnishings that had been his mother's; a Hawaii timeshare; and his mother's china. The trial court also awarded $11,000 to J.M. in reimbursement for having paid off the note on the Toyota Siena with his separate property inheritance and ordered C.M. to pay that amount to J.M., in addition to ordering C.M. to pay to J.M. 50% of the air conditioning and roof repairs expended on Cedar and 42.274% of the air conditioning and roof repairs expended on Kirkhaven during the divorce's pendency within five days of her receipt of any funds from the sale of either residence.

[12]Kirkhaven's closing disclosure reflected that the property's sale price was $385,000 ($386,624.65 after property taxes and HOA dues were paid by the seller in advance). From this amount, $25,190.10 was paid in closing costs; $14,766.43 was paid to the receiver; $51,799 was paid to J.M.'s attorney; $54,568.46 was paid to C.M.'s attorney; $9,216.25 was paid to the children's ad litem; and $31,438.95 was paid in property taxes, other taxes, costs, insurance, and research fees. After all of these deductions, J.M. received the remaining amount.

[13]J.M. argues that the trial court mischaracterized Cedar as his separate property and failed to grant to the community estate and his separate estate the proportion that each estate supplied in consideration for its purchase, thereby divesting him of more than $370,000 of his separate property and awarding it to C.M.

7

C.M. responds that J.M.'s appeal should be dismissed under the acceptance-of-benefits doctrine because J.M. spent the Kirkhaven funds that he received as reimbursement on things that were not economic necessities and that benefitted only him, resulting in uncurable prejudice to her if there is a remand. *See F.M.G.W. v. D.S.W.*, 402 S.W.3d 329, 334 (Tex. App.—El Paso 2013, no pet.) (explaining that the acceptance-of-benefits doctrine is a jurisdictional rule, the application of which renders an appeal moot and deprives the appellant of standing); *see also Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000) ("The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit.").

J.M. replies that dismissing his appeal under the acceptance-of-benefits doctrine would be inequitable and contrary to *Kramer v. Kastleman*, 508 S.W.3d 211 (Tex. 2017), contending that C.M. has failed to carry her burden to show his clear intent to acquiesce in the judgment or evidence of irremediable prejudice to her. J.M. insists that without using the Kirkhaven proceeds, he would have lacked funds for this appeal.

J.M. also argues that the application of the doctrine is improper because C.M. "conceded and agreed to [his] entitlement to the very distribution of Kirkhaven proceeds about which she now complains, when she signed 'agreed' to the October 25, 2019 Agreed Order Confirming Sale" and is thereby estopped from taking a contrary position on appeal. He additionally contends that the reimbursement award

8

was severable from the remainder of the couple's assets because it was subject to that agreed order.

J.M. further asserts that C.M. offered no evidence that on remand his separate estate would not be entitled to the same reimbursement based on tracing his separate-property payment of the balance of the Kirkhaven loan or why she would not be bound by her trial stipulation and agreement to the payment of both parties' attorney's fees and the ad litem's attorney's fees from the Kirkhaven proceeds. And he contends that he "offered uncontradicted proof of his economic necessity" when he received the Kirkhaven proceeds, including his unemployment since 2018.[14] Finally, J.M. also argues that C.M. offered no evidence of why he could not make up the "dissipated" amount if a different division were granted upon retrial.

We dismiss the appeal because J.M.'s acceptance and use of the benefits of the divorce decree has caused uncurable prejudice to C.M.

---

[14]In *Waite v. Waite*, the ex-husband argued that financial hardship compelled him to accept the judgment's benefits because of his unemployment and lack of other sources of income, contrary to the trial court's findings that he had substantial earning capacity and employment opportunities based on his work experience as a broker earning in excess of $200,000 annually and his service on a board of directors wherefrom he "receive[d] substantial compensation." 150 S.W.3d 797, 806 (Tex. App.—Houston [14th Dist.] 2004, pet. denied). J.M. does not challenge the trial court's May 30, 2019 fact finding, for purposes of assessing $2,800 a month in child support, that his monthly net resources were $8,000.

9

## II. Discussion

The acceptance-of-benefits doctrine bars an appeal if an appellant voluntarily accepts the judgment's benefits and the opposing party is thereby disadvantaged. *J.F. v. J.F.*, No. 02-19-00029-CV, 2020 WL 4248681, at *1 (Tex. App.—Fort Worth July 23, 2020, pet. denied) (mem. op.) (citing *Kramer*, 508 S.W.3d at 217). It is a fact-dependent, estoppel-based doctrine focused on preventing unfair prejudice to the opposing party, and before denying a merits-based resolution to a dispute, we must evaluate (1) whether, by asserting dominion over assets awarded in the judgment under review, the appellant clearly intended to acquiesce in the judgment, (2) whether the assets have been so dissipated as to prevent their recovery if the judgment is reversed or modified, and (3) whether the opposing party will be unfairly prejudiced. *Id.*; *see Kramer*, 508 S.W.3d at 226 ("Divorce cases involving acceptance-of-benefits claims present myriad factual scenarios and multi-faceted aspects."). The doctrine's premise is that a party cannot treat a judgment as both right and wrong, and the appellee bears the burden to prove that the appellant is estopped by it. *Williams v. LifeCare Hosps. of N. Tex., L.P.*, 207 S.W.3d 828, 830 (Tex. App.—Fort Worth 2006, no pet.).

## A. Acceptance-of-Benefits Factors

Overlapping nonexclusive factors that inform the estoppel inquiry may include:

- whether the acceptance of benefits was voluntary or was the product of financial duress, where "financial duress" means that "the appellant otherwise lacked sufficient funds to provide the necessities of life";[15]

- whether the right to joint or individual possession and control preceded the judgment on appeal or exists only by virtue of the judgment;

- whether the assets have been so dissipated, wasted, or converted as to prevent their recovery if the judgment is reversed or modified;

- whether the appealing party is entitled to the benefit as a matter of right or by the nonappealing party's concession;

---

[15]"Necessities of life" are items such as adequate food, clothing, shelter, utilities, and medical attention, *Marion v. Davis*, 106 S.W.3d 860, 865–66 (Tex. App.—Dallas 2003, pet. denied), but not attorney's fees. *See Tedder v. Gardner Aldrich, LLP*, 421 S.W.3d 651, 656 (Tex. 2013) ("We have suggested that a spouse's necessaries [under spousal support statute] are things like food, clothing, and habitation⸗that is, sustenance—and we have squarely rejected the view that a spouse's legal fees in a divorce proceeding fall into this category."). However, in a divorce suit, the trial court has equitable power to award attorney's fees as a part of the just and right division of the marital estate. *Mandell v. Mandell*, 310 S.W.3d 531, 541 (Tex. App.—Fort Worth 2010, pet. denied); *see Murff v. Murff*, 615 S.W.2d 696, 699 (Tex. 1981) (stating that attorney's fees are among many factors courts may consider in making a just and right division of the marital estate). In the divorce decree here, the trial court stated that to effect an equitable division of the parties' estate, each party would be responsible for his or her own attorney's fees, expenses, and costs. Under the terms of that section of the decree, J.M. agreed to an order to pay his trial counsel $51,799.20 from his equity share of the first house to sell, with the remainder (if any) paid from his equity share of the second, and C.M. likewise agreed to an order to pay her counsel $54,568.46 from her equity share of the first house to sell, with the remainder (if any) paid from her equity share of the second.

11

- whether the appeal, if successful, may result in a more favorable judgment but there is no risk of a less favorable one;

- if a less favorable judgment is possible, whether there is no risk the appellant could receive an award less than the value of assets dissipated, wasted, or converted;

- whether the appellant affirmatively sought enforcement of rights or obligations that exist only because of the judgment;

- whether the issue on appeal is severable from the benefits accepted;

- the presence of actual or reasonably certain prejudice; and

- whether any prejudice is curable.

*Kramer*, 508 S.W.3d at 224, 228–29. Mere deprivation of possession, use, and enjoyment of property that had been jointly owned is not, in and of itself, sufficient to constitute prejudice. *Id.* at 229–30.

In *Kramer*, our sister court dismissed the ex-wife's appeal without reaching its merits after she accepted $20,000 per month in rental proceeds from property awarded to her in the decree and refinanced the property. *Kastleman v. Kastleman*, No. 03-13-00133-CV, 2014 WL 3809759, at *3 (Tex. App.—Austin July 30, 2014), *rev'd sub nom. Kramer*, 508 S.W.3d at 232. The ex-wife had argued in the intermediate court that her acceptance of the rental proceeds[16] fell under the cash-benefits exception[17] to the

---

[16]The supreme court, in its review of the case's background, stated that the parties' marital estate was worth $30 million (rather than $3.2 million, as stated in the lower court opinion). *Kramer*, 508 S.W.3d at 214. The ex-wife originally argued that

acceptance-of-benefits doctrine and had testified that she would be able to make any funds she had accepted available to be divided by the court in the event of a remand. *Id.* at *3. Our sister court noted that she did not challenge the trial court's finding that she had accepted substantial assets and funds in excess of $1 million and that her testimony necessarily established that she had accepted real property in addition to cash payments (she had refinanced the properties and took the ex-husband's name off of the notes), thus depriving her of the cash-benefits exception. *Id.* & n.5. It also held that the ex-wife had waived her economic necessity argument through inadequate briefing but noted that the record reflected that she had been awarded substantial assets in addition to the revenue-generating rental properties. *Id.* at *4. And it noted that the ex-wife had failed to supersede the judgment. *Id.*

---

she had accepted $320,000, or 1/10 the value of the community estate, but she changed that argument in a motion for rehearing to 1%, not 10%. *Kastleman v. Kastleman*, No. 03-13-00133-CV, 2014 WL 5420411, at *1 & n.1 (Tex. App.—Austin Oct. 23, 2014) (supp'l op. on reh'g), *rev'd sub nom. Kramer*, 508 S.W.3d at 232. The supreme court noted that in its supplemental opinion, the intermediate court had refused to partially reinstate the appeal when the ex-wife raised sanctions, attorney's fees, child support, and child custody because she had failed to address the severability of those issues in response to the ex-husband's motion to dismiss. *Kramer*, 508 S.W.3d at 216. The supreme court did not reach severability in its review. *Id.* at 217.

[17]The cash-benefits exception applies when only cash benefits are accepted. *Kastleman*, 2014 WL 3809759, at *3. The theory is that because cash is fungible, if it can be restored or otherwise taken into consideration in redivision of the marital estate, its use does not prejudice the nonappealing party and does not bar the appeal. *Kramer*, 508 S.W.3d at 224.

13

The supreme court reversed our sister court's judgment and remanded the case for consideration of the appeal's merits. *Kramer*, 508 S.W.3d at 213–14. Before doing so, however, the supreme court set out the nonexclusive factors listed above to be considered in balancing the equities. *Id.* at 228–29. In applying those factors, the court noted that the divorce decree had required the ex-wife to refinance the rental properties under threat of forced sale, making her refinancing decision and acceptance of the real property involuntary, and that the intermediate court had failed to consider prejudice to the ex-husband if the $30-million marital estate were to be redivided on remand. *Id.* at 215, 219, 231 ("The decree mandated such action upon pain of forced sale; the apartment complexes apparently remain available to be returned to the marital estate; and no prejudice to Kastleman is apparent."). There were also some partnership interests involved, but the court stated that there was no evidence that they could not be returned and taken into account in a new just-and-right division and that the ex-husband's claim of prejudice with regard to those assets was "entirely speculative." *Id.* at 231.

The court noted that the ex-husband would be prejudiced by his ex-wife's successful appeal "only if [she] receives a lesser share of the estate assets on redivision of the estate *and* she would be unable to make up the difference through reimbursement to the estate or by sale of assets awarded to her," and there was no evidence or allegation that the assets had been so dissipated, wasted, or converted as to prevent a just-and-right division if the judgment was reversed or modified. *Id.*

14

After applying the factors, the supreme court held that the ex-husband had failed to show any prejudice and that the circumstances did not reflect the ex-wife's clear intent to acquiesce in the judgment's validity. *Id.* at 231–32. In conclusion, it stated that "a merits-based disposition must not be denied absent disadvantage for the opposing party and circumstances reflecting clear intent to acquiesce in the judgment's validity." *Id.* at 232.

In *J.F.*, we considered the application of the acceptance-of-benefits doctrine as set out by the supreme court in *Kramer*. 2020 WL 4248681, at *1–2.[18] In *J.F.*, the pro se ex-wife argued that her ex-husband should be estopped from challenging the divorce decree under the acceptance-of-benefits doctrine on the basis of prejudice when he exercised dominion over community property such as insurance proceeds and gold and platinum coins, among other things. *Id.* But none of her record citations supported most of her assertions about his post-divorce conduct. *Id.* at *2. And although there was evidence that he had spent income and liquidated assets from the family business, which made up part of the community estate, there was no realistic possibility that it would prejudice her because the business was a valuable asset in his hands but essentially worthless if awarded to her, preventing a redivision

---

[18]Our other post-*Kramer* cases in which the acceptance-of-benefits doctrine has been raised have not involved divorces. *See Suite 900, LLC v. Vega*, No. 02-19-00271-CV, 2020 WL 2608394, at *8 (Tex. App.—Fort Worth May 21, 2020, pet. filed) (mem. op.) (quiet-title action); *Parker v. Glasgow*, No. 02-15-00378-CV, 2017 WL 2686474, at *4 (Tex. App.—Fort Worth June 22, 2017, no pet.) (mem. op.) (legal-malpractice action).

15

of the community assets in her favor. *Id.* at *1–2. And she "produced no evidence that Husband took any other sorts of actions that might prejudice her." *Id.* at *2. Accordingly, we held that the ex-wife had failed to carry her burden to show that the acceptance-of-benefits doctrine barred his appeal. *Id.*

As noted by commentators, to use the acceptance-of-benefits doctrine post-*Kramer*, the appellee in a divorce appeal has the burden to show that the appellant took "actions such as accepting property and then disposing of it to the extent that the marital estate cannot be made whole in the event of a successful appeal . . . [, which] will only apply to very narrow factual situations." Anna K. Teller & Donald E. Teller, Jr., *Family Law*, 4 SMU Annual Tex. Survey 161, 170 (2018).

## B. Application

We must determine whether C.M. carried her burden to show that the acceptance-of-benefits doctrine bars our consideration of the merits of J.M.'s appeal.

### 1. Salient Facts

The divorce decree required the sale of both Kirkhaven and Cedar, and the distribution of the sales proceeds was set out in a subsequent order issued July 8, 2019, as follows: (1) ordinary costs of sale; (2) broker's commissions; (3) receiver fees; (4) the parties' attorney's fees; (5) separate property reimbursement to J.M. for Kirkhaven; and (6) funds due the parties according to the ownership percentages in the divorce decree. C.M.'s counsel signed "agreed as to form" on the order appointing a new receiver different from the one initially appointed in the divorce

16

decree; the order set out the same distribution above. J.M., representing himself pro se at the time, did not sign the order at all. On October 25, 2019, both parties signed "agreed" on the trial court's "agreed order confirming sale," which confirmed the receiver's authority to sell Kirkhaven pursuant to the sales contract attached to the order, ordered that Kirkhaven be sold by the receiver pursuant to that sales contract, and ordered that the sales proceeds be disbursed as directed in the July 8, 2019 order. Accordingly, prior to his receipt of any funds from the Kirkhaven sale, in addition to the broker's commission and receiver fees, the Kirkhaven sales proceeds paid for $51,799.20 in J.M.'s attorney's fees (and for $54,568.46 in C.M.'s attorney's fees) as set out in the divorce decree.

J.M. received $199,645.26 from the November 5, 2019 Kirkhaven sale. On November 6, 2019, he requested a 60-day extension to file his appellate brief,[19] stating that he had just signed a contract with appellate counsel (who filed a notice of appearance that day), because he had "closed on the sale of real property, which has finally provided [him] with funds to retain counsel."[20] J.M. paid a $25,000 retainer to his appellate counsel.

---

[19]We notified J.M. on October 8, 2019, that his appellate brief would be due on November 6.

[20]J.M. has asked us to take judicial notice of his pro se filings in this court, including his unopposed motion for extension of time to file his brief, in which he referenced Kirkhaven's sale as providing him with funds to retain counsel.

J.M. subsequently paid $181.50, $106, and $55 for preparation of supplemental clerk's records, and three $10 motion fees. In total, not counting his appellate attorney's fees, J.M. has paid $4,870.25 in pursuit of this appeal, although he paid the bulk of this amount ($4,497.75) *before* receiving the Kirkhaven funds.[21] He also paid $2,000 to his attorney to request suspension of enforcement of the judgment on January 10, 2020, but decided against pursuing that at the February 7, 2020 hearing on the motion, seeking instead to have the proceeds of Cedar's eventual sale put into the court's registry.

On February 6, 2020, J.M. filed an unsworn net worth declaration before the hearing on his supersedeas motion the next day. In his unsworn declaration of negative net worth, J.M. stated that he had less than $25,000 in his bank account, was performing contract packing-and-shipping work for $10.50 an hour for 4 to 5 hours a day, and owed $125,900.92, not counting foreclosure proceedings and unpaid taxes on the $800,000 in stock withdrawals incurred when he liquidated the stock he had inherited from his mother.

---

[21]J.M. filed a pro se notice of appeal on July 23, 2019, and on August 9, 2019, we notified him that if he did not pay the $205 filing fee, we would dismiss the appeal. On August 21, 2019, we received a request for an extension of time from the court reporter, stating that she had not received a deposit for payment until August 20, 2019, at 8 p.m. We also received that day a notice from the trial court clerk, informing us that J.M. had not paid the $147 he owed for preparation of the clerk's record. J.M. paid for the clerk's record on August 27, 2019. He paid the appeal's filing fee on August 30, 2019. And he paid $4,145.75 for the multi-volume reporter's record on October 7, 2019.

At the February 7, 2020 hearing, J.M. replied, "Yes, Your Honor," when—with regard to the $199,645.26 he had received from the Kirkhaven sale—the trial court asked, "Is the testimony of your client that *the only thing that he has left from that distribution of funds is $25,000*?" [Emphasis added.] Based on his testimony at the February 7, 2020 hearing and his initial unsworn net worth declaration, then, J.M. had spent $174,645.26 of the $199,645.26 from the Kirkhaven distribution allocated to him via the judgment. *See Kramer*, 508 S.W.3d at 218 (noting that the acceptance-of-benefits doctrine's "equitable objective of precluding an appeal when a litigant's actions are inconsistent with a claim of error furthers finality, preserves scarce judicial resources, and guards against gamesmanship").

What did J.M. spend the money on? Some of J.M.'s liabilities were discussed at the hearing. One of them was the $50,691 that he owed to C.M. in back child support, but he stated at the hearing, "I cannot prove that I have paid child support," and he agreed that he had not used any of the $199,645.26 to pay child support through the Attorney General's disbursement unit, even though the divorce decree specifically required his child support payments to be made through the disbursement unit and specifically stated that no credit would be given for informal payments.[22]

---

[22]The decree stated,

> No Credit for Informal Payments
>
> IT IS ORDERED that the child support as prescribed in this decree shall be exclusively discharged in the manner ordered and that

J.M. also failed to pay his share of the taxes on Cedar (according to the decree, 100% of the taxes accrued prior to July 23, 2018, and 50% of those accrued thereafter). C.M. testified that the taxes had not been paid on Cedar since 2016, that foreclosure suits were pending against the property, and that if the foreclosures went forward, she would receive no money from the sale of the home.

J.M. testified that he gave his girlfriend a $35,000 certified check from the Kirkhaven proceeds to repay loans that she had made to him. And he purchased a used 2010 BMW, making a down payment of $6,700 in cash on the $9,000 vehicle and announcing the BMW's purchase in a celebratory Facebook post on November 20, 2019, even though the record reflects that the divorce decree had awarded to him a 2006 Audi and a Nissan van from the community estate, in addition to confirming a 2009 Mercedes ML550 as his separate property. J.M. did not mention during the hearing whether he was still in possession of these other vehicles.

Nine days after the February 6, 2020 hearing, J.M. signed his first amended unsworn declaration of net worth in which he declared that he actually had $156,149 in assets—not including Cedar's value, $9,000 that C.M. owed to him under the

any direct payments made by [J.M.] to [C.M.] or any expenditures incurred by [J.M.] during [J.M.'s] periods of possession of or access to the children as prescribed in this decree, for food, clothing, gifts, travel, shelter, or entertainment are deemed in addition to and not in lieu of the support ordered in this decree.

divorce decree, the New York and Hawaii timeshares (upon which he owed back fees), and his mother's jewelry, which he alleged that C.M. had refused to give to him—and $152,956.52 in debts, not including any unpaid taxes on the stock liquidation.  Included in his amended declaration was his apology for having failed to disclose all of his assets prior to the February 7, 2020 hearing: "Between my mental illness and ADHD I sometimes have difficulty complying with my attorney's request for information and documents."

In his amended unsworn declaration of net worth, J.M. listed the following assets to reach the $156,149 amount:  $5,000 (BMW car resale value);[23] $33,000 (401k); $20,000 (CD); $10,000 (Credit Building Account); $30,000 (Credit Building Account); $20,000 (Credit Building Account); $5,000 (Credit Building Account); $19,000 (Cash Management Account); $987 (prepaid card); $4,161 (prepaid card); $9,001 (Money Maker)".

Other than the BMW, nothing in the record directly ties J.M.'s listed assets to the $199,645.26 from the Kirkhaven sale.  In his reply brief, however, J.M. argues that after his receipt of the Kirkhaven proceeds, his first amended net worth declaration—which he filed after the February 2020 hearing—evidenced assets of approximately $142,000, listing in his brief the following assets: BMW ($5,000); 401k ($33,000); CD ($20,000); Credit building account ($10,000); Credit building account ($30,000); Credit

---

[23]J.M. did not list any vehicle other than the BMW as an asset.

21

building account ($20,000); Credit building account ($5,000), and cash management account ($19,000). Missing from this recital are the $987 prepaid card; the $4,161 prepaid card; and the $9,001 "Money Maker", for a total amount of $14,149. J.M. argues that his first amended net worth declaration showed that he had only dissipated $57,000 of the $199,645.26. He states that he had the $142,000 in assets "after receipt of the $199,645.26, and payment of the aforementioned expenditures." J.M. relies on the $142,000 amount to assert that he has "assets to offset all but the $57,000 of the Kirkhaven proceeds that were distributed to him."

## 2. Right to Benefits

J.M. had a right to joint possession and control of Kirkhaven, a property titled in both parties' names, prior to the judgment. However, but for the judgment entitling his separate estate to equitable reimbursement and the trial court's subsequent order on the distribution of the proceeds, J.M. would not have had an exclusive right to the $199,645.26 in cash. *See Kramer*, 508 S.W.3d at 228–29. And, as pointed out by C.M., the record reflects that after Kirkhaven was sold, J.M. instructed his bank to contact the title company for the wire transfer of the funds to him. And then he proceeded to use those funds. Accordingly, this factor weighs in C.M.'s favor. *See id.* at 229 (listing as a factor "whether the appellant affirmatively sought enforcement of rights or obligations that exist only because of the judgment"); *cf. Robertson v. Robertson*, No. 13-16-00309-CV, 2017 WL 6546005, at *9 (Tex. App.—Corpus Christi Dec. 21, 2017, no pet.) (mem. op.) (holding acceptance-of-benefits

22

doctrine did not apply when ex-husband's actions were not voluntary with regard to deeding home to ex-wife and paying line of credit secured by the home—both actions were required in the divorce decree).

### 3. Type of Acceptance

The acceptance of benefits may be rendered involuntary because of financial duress or other economic circumstances. *Waite*, 150 S.W.3d at 803. Likewise, the person to be estopped by the doctrine must have had knowledge of all material facts in making the decision to accept the benefits. *Little v. Delta Steel, Inc.*, 409 S.W.3d 704, 713 (Tex. App.—Fort Worth 2013, no pet.). "[A]nticipating future expenses months in advance cannot be said to constitute economic necessity that would render the acceptance of benefits under a disputed divorce decree involuntary." *In re Marriage of Stegall*, 519 S.W.3d 668, 673 n.2 (Tex. App.—Amarillo 2017, no pet.).

Regarding whether J.M.'s acceptance and use of any of the $199,645.26 was voluntary or the product of financial duress, in February 2020, J.M. first claimed that his net worth was $25,000 and then that it was $156,149 but also that—under either calculation—his net worth was essentially negative because, not counting the pending foreclosure proceedings on his Hawaii and New York timeshares, he had almost $126,000 in liabilities, and had lost his well-paying job in December 2018.[24] He anticipated being able to save the timeshares from foreclosure with money from the

---

[24]J.M. had been employed during the 2018 trial making $66.18 an hour (more with overtime), for around $100,000 a year.

sale of Cedar. J.M. did not include his separate-property stake in Cedar in his net worth calculation.

J.M. claimed at the hearing that he had spent some of the Kirkhaven money on food and to live on—funds "provid[ing] the necessities of life," *see Kramer*, 508 S.W.3d at 224—but he acknowledged that he had been criticized during trial for spending a lot of money in a short amount of time, and the record reflects that many of the items upon which he spent money during trial were not necessities.[25] Of the $2.25 million that J.M. inherited after his mother's death in July 2013, only around $600,000 remained by the time the trial began in February 2018—not counting the two houses and not accounting for the taxes that he owed the IRS from the sale of his mother's investments—and two years later, he first claimed that he had only $25,000 to his name and then that he had only $156,149. Notwithstanding J.M.'s argument in his reply brief, the Kirkhaven disbursement is not specifically identified in the latter tally. Assuming that the Kirkhaven disbursement *was* included in these tallies, though, they

---

[25]During trial, J.M. acknowledged that he had spent $450,000 in the preceding 14 months, of which $150,000 had been cashed out of a community 401(k), even though the only items he had been ordered to pay were utilities, homeowners' association fees, taxes on the two houses, the van lease, and $465 a month in preschool tuition for the parties' youngest child. C.M. characterized his spending as "bl[owing] through hundreds of thousands of dollars on needless stuff," and testified that between November 2016, when the parties separated, and the first two days of the trial (February 15 and 16, 2018), J.M. had spent $50,000 at retail stores, $11,000 on dining out, $1,300 at bars and clubs, $3,300 on vacations, and $12,000 on entertainment and luxury (movies, nail salons, video games, and massages), continuing to spend in this manner even after he lost his job.

reflect that J.M. managed to spend between $43,496.26 and $175,645.26 of the $199,645.26 from November 2019 to February 2020.[26]

The record reflects that after J.M. obtained the $199,645.26, he gave his girlfriend a $35,000 certified check to repay loans that she had made to him, and *none* of his testimony explained how such repayment amounted to an economic necessity or why it had to be done while his appeal was pending. He also spent some of the money on attorney's fees and some of it on purchasing a vehicle. Nothing in the record explains how the vehicle purchase was a necessity when J.M. was awarded an Audi and a van in the divorce decree, which also confirmed a Mercedes as his separate property. Even if J.M.'s trial testimony that the Audi was not drivable meant he could not use it for transportation, nothing in the record indicated that the van and the Mercedes were not in a drivable condition or why purchasing the BMW with the proceeds of the Kirkhaven sale was a necessity (or why these assets, if he still had them, were not listed in his declarations of net worth).

The record reflects that J.M. received $199,645.26 in equitable reimbursement from C.M.'s separate estate pursuant to the judgment after the November 5, 2019 sale

---

[26]Historically, pre-*Kramer*, the acceptance-of-benefits doctrine did not apply if a party sought temporary orders pending appeal to allow him to take actions such as paying attorney's fees, using money in his possession for reasonable and necessary living expenses, and managing financial assets to preserve capital. *Sprague v. Sprague*, 363 S.W.3d 788, 794 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (citing *McAlister v. McAlister*, 75 S.W.3d 481, 483–84 (Tex. App.—San Antonio 2002, pet. denied), and *Waite*, 150 S.W.3d at 807 n.13); *see* Tex. Fam. Code Ann. § 6.709. The record does not reflect that J.M. sought any such orders.

of Kirkhaven and that, by the time of the February 7, 2020 hearing sought by J.M. to request suspension of enforcement of the judgment, almost none of those funds remained. Further, it reflects that for the most part, over the course of the divorce proceedings and thereafter, J.M. created many of the circumstances that might otherwise have made his acceptance of some of the benefits involuntary. *Cf. Waite*, 150 S.W.3d at 803 (noting that an exception to the acceptance-of-benefits doctrine is when the acceptance is involuntary because of financial duress or other economic circumstances). Without counting his trial attorney's fees, his post-trial attorney's fees, or the $4,870.25 that he has spent on the appeal, the record reflects that J.M. voluntarily spent at least $41,700 of the $199,645.26 on items that were not economic necessities, and the record does not reflect what portion of the remainder was spent on economic necessities versus the types of purchases he made prior to and during the divorce proceedings, which are amply reflected in the record. *Cf. Garza v. Garza*, 155 S.W.3d 471, 475 (Tex. App.—San Antonio 2004, no pet.) (holding that ex-wife's appeal was not precluded by the acceptance-of-benefits doctrine because her uncontroverted testimony established that her expenses far exceeded her income and that she had no other assets that she could use to pay for basic living expenses). Accordingly, this factor weighs in C.M.'s favor. *See Kramer*, 508 S.W.3d at 228.

### 4. Dissipation

As set out above, at least $41,700 of J.M.'s spending of his recovery under the judgment was voluntary, and much—if not all—of the $199,645.26 granted to J.M. as

equitable reimbursement to his separate estate had been dissipated by the time of the trial court's February 2020 hearing. Granting an equitable reimbursement claim is within the trial court's discretion. *Penick v. Penick*, 783 S.W.2d 194, 198 (Tex. 1988) ("The discretion to be exercised in evaluating a claim for reimbursement is equally as broad as that discretion subsequently exercised by the trial court in making a 'just and right' division of the community property.").

Based on both of his declarations of net worth, J.M. has debts that either exceed his assets or that will soon eclipse any of his remaining assets. Notwithstanding the award's fungibility as cash, because the record reflects J.M.'s longstanding pattern of profligate spending, unsound financial decisions, and unemployment, the equitable reimbursement funds that he has already expended are unlikely to be recovered if the judgment is reversed and then modified on remand in reevaluating the equitable division of the marital estate and the parties' reimbursement claims. *See id.* at 197–98 (comparing claim for reimbursement to an action for quantum meruit); *see also Kramer*, 508 S.W.3d at 228–29; *cf. Demler v. Demler*, 836 S.W.2d 696, 698 (Tex. App.—Dallas 1992, no writ) (noting that when ex-wife accepted a cash award and it appeared from the property settlement that she would have sufficient assets to cover a possible reimbursement of those funds, acceptance-of-benefits doctrine did not prevent her appeal because there was no possibility that a reversal of the judgment would affect the ex-husband's rights to the benefits secured under the

27

judgment), *disapproved of on other grounds by Dallas Mkt. Ctr. Dev. Co. v. Liedeker*, 958 S.W.2d 382 (Tex. 1997). Accordingly, this factor weighs in C.M.'s favor.

### 5. Judgment Risk Factors, Severability, and Concession

J.M. brought this appeal seeking a redistribution of $370,000 that he claims the trial court awarded to C.M. based on Cedar's mischaracterization. He does not challenge the trial court's child custody or support provisions or the decision to grant the couple's divorce. J.M. instead prays for the divorce- and child-related provisions to be severed from the property division and for a remand for a just and right property division based on Cedar's correct characterization, seeking an award to him of a separate property interest in Cedar or reimbursement of that amount in proportion to the contributions his separate estate made to its purchase, or an order granting him the right to retain Cedar and to "buy out [C.M.'s] Community interest, suspend the sale[,] and discharge the receiver."

During trial, J.M.'s forensic financial expert calculated the interests in Cedar using both a pro rata approach and a separate-out-first approach. One of the approaches showed that J.M. had a 91.049% separate property interest in Cedar and that the community estate had an 8.591% interest in it. In his first amended inventory and appraisement during trial, J.M. asserted that 91.049% of Cedar—$823,362—had been contributed from his separate property while only 8.951% of Cedar—$73,696.04—had belonged to the community.

28

The expert's other calculation showed that J.M. had an 89.248% separate property interest and that the community estate had a 10.752% interest. On appeal, J.M. claims that the community portion was 10.752% and his separate property portion was 89.248%, that "[i]t is undisputed that the Community estate ultimately made at least $105,000 in combined payments toward the purchase price," and—assuming a $950,000 value of the home—that his "separate property share should be $847,856" and the "undivided Community interest should be $102,144." J.M.'s expert also testified that the total amount of possible reimbursement claims for the court to consider was $892,680.30.

C.M. testified at trial that she had sold her father's home, which she inherited, and had given J.M. a $100,000 check from that sale after Cedar was purchased. The check, dated July 6, 2016, and endorsed by J.M., was admitted into evidence. C.M. asked the trial court to reimburse her that amount if it did not find that Cedar was half her separate property.

As to severability, "[o]nce reversible error affecting the 'just and right' division of the community estate is found, the court of appeals must remand the entire community estate for a new division." *Jacobs v. Jacobs*, 687 S.W.2d 731, 733 (Tex. 1985); *see Cutler v. Cutler*, No. 04-15-00693-CV, 2016 WL 4444418, at *4 (Tex. App.—San Antonio Aug. 24, 2016, no pet.) (mem. op.) (holding that when the trial court's error materially affected its division of the community estate, the court of appeals had to reverse the equitable reimbursement award and remand the entire community

29

estate for a new just-and-right division of the property); *cf.* Tex. R. App. P. 44.1(b) (noting that if error affects part but not all of the matter in controversy and that part is separable without unfairness to the parties, the judgment must be reversed and a new trial ordered only as to the part affected by the error).

If we were to evaluate the merits of this appeal and confirm the error asserted by J.M. in the division of the marital estate, we would have to remand the case for the trial court to re-evaluate its just and right division of the marital estate and its decision to award reimbursement, presenting a risk to J.M. that he could receive a less favorable judgment overall than that from which he appeals because the issue is not severable from the benefits that he accepted. *See Kramer*, 508 S.W.3d at 229. That is, the trial court took the equities into consideration in making its previous allocation (including attorney's fees paid from the sale of Kirkhaven), and J.M. asks us to assume that Cedar's sale price will meet his expectations and that the house will not be lost to foreclosure before remand. We think it more likely, under the unique circumstances presented by these parties, that there might not even be an asset subject to reallocation by the time of remand. Assuming any assets might remain on remand, J.M.'s risk likewise could result in an award of less value than the assets that he has already accepted and dissipated from the Kirkhaven sale, which were allocated to him as an equitable reimbursement from C.M.'s separate estate. *See id.*

With regard to J.M.'s concession argument, we acknowledge that under the acceptance-of-benefits doctrine, when the appellant accepts only the part of the

judgment that the appellee concedes is owed to the appellant, the appellant is not estopped from appealing. *Waite*, 150 S.W.3d at 804; *see Kramer*, 508 S.W.3d at 218 (explaining that acquiescence in the final judgment's validity cannot be inferred if the litigant's entitlement to the benefit is undisputed and unaffected by the appeal's outcome; "[i]n such circumstances, the benefit accepted is not actually at issue on appeal, cannot be affected by reversal because the opposing party does not deny the appellant's right to retain the benefit, and dissipation by the appealing party thus could not prejudice the opposing party").

But that exception is narrow and is subject to the answer of the following questions: (1) Could a reversal of that portion of the judgment possibly affect the appellant's right to the benefits secured by him under the judgment? (2) And would the appellee be compelled to concede upon another trial that the appellant has the right to retain those benefits regardless of the litigation's outcome? *Waite*, 150 S.W.3d at 807 (citing *Carle v. Carle*, 234 S.W.2d 1002, 1004 (Tex. 1950)). "The appellant's right to the property must be unquestionable." *Id.*

The record reflects that while J.M. paid the remainder of the Kirkhaven mortgage with his separate property inheritance, his reimbursement came out of C.M.'s separate property interest in the sales proceeds, an amount that could shift on remand in a new contest regarding the equities and the minimal community property left. *See id.* at 807–08 (holding that ex-husband's argument failed to recognize that the court had divided community property unevenly because of his behavior during the

marriage and would have to re-divide the assets to reach a new "just and right" division if it erred by characterizing the ex-husband's claimed cash as community property); *see also Kramer*, 508 S.W.3d at 216 ("This, of course, is always the case when remand is required based on a material error affecting the trial court's just-and-right property division; a party could always get more, less, or different.").

Further, the argument that C.M. agreed to J.M.'s reimbursement award by signing the October 25, 2019 "Agreed Order Confirming Sale," is a nonstarter because that order was a confirmation pursuant to the divorce decree's requirement that a receiver sell Kirkhaven, and it was made for the benefit and security of the property's buyers. Furthermore, whether C.M. agreed to the reimbursement appears to go to the overall merits of J.M.'s appeal, not his right to a merits-based disposition thereof. *See Kramer*, 508 S.W.3d at 232 (stating that whether the ex-wife was estopped from appealing when she agreed to the property division by executing a property settlement agreement went to the merits of the appeal and not the ex-wife's right to a merits-based disposition of it). We conclude that the risk factors weigh in C.M.'s favor.

### 6. Prejudice

Finally, we must consider the presence of actual or reasonably certain prejudice to C.M. and whether that prejudice is curable.

"The prejudice inquiry considers whether the benefits themselves—or the proceeds from their sale—remain available for redistribution or have been so

32

dissipated, wasted, or otherwise converted as to prevent their recovery." *Kramer*, 508 S.W.3d at 221–22.

As argued by C.M., on remand, the community estate "will be substantially different from the one that was before the trial court originally" because Kirkhaven is no longer among the parties' assets and "almost all of the net proceeds from its sale were awarded to [J.M.] as either his separate property or as part of an equitable reimbursement claim, and he has received and spent substantially all of those funds he received solely as a result of the trial court's judgment." C.M. also notes that only after J.M. had spent the proceeds from the Kirkhaven sale did he seek to suspend enforcement of the trial court's judgment,[27] when he could have done so before spending that money to avoid actual prejudice to her. And any remand would force C.M. to incur attorney's fees beyond those which she has already incurred in defending against J.M.'s appeal of the trial court's judgment, and her testimony at the February 2020 hearing reflected that her annual income was "about 15,000 a year" because she had been laid off from one of her two jobs.

Finally, as C.M. points out, because J.M. has dissipated the benefits he accepted and because his net worth is negative and he remains unemployed or underemployed, the prejudice to her is no longer curable, notwithstanding his contentions about Cedar's anticipated net proceeds. Thus, the prejudice factors also weigh in C.M.'s

---

[27]Historically, there is no acceptance of benefits when an appealing party posts a supersedeas bond to suspend the judgment. *Sprague*, 363 S.W.3d at 793–94.

favor. *Cf. Kramer*, 508 S.W.3d at 229 (noting that the absence of prejudice should prevent the doctrine's application in most cases).

### 7. Conclusion

Based on the weight of the factors above and the record before us, we conclude that C.M. has met her burden and that the acceptance-of-benefits doctrine should apply here. The level of overall dissipation combined with actual prejudice to C.M. and J.M.'s inability to cure that prejudice forces us to conclude that even if some of J.M.'s acceptance of the benefits of the trial court's judgment may have been compelled by economic necessity and even if he might receive a more favorable judgment on remand, enough of his acceptance of the judgment's benefits was voluntary to sustain C.M.'s argument that the appeal should be dismissed. *Cf. Kramer*, 508 S.W.3d at 232 ("Based on the record before the Court, we conclude prejudice is lacking and the circumstances do not reflect Kramer's clear intent to acquiesce in the judgment's validity. The court of appeals therefore erred in dismissing Kramer's appeal.").

## III. Conclusion

Based on our analysis above and without reaching the merits of J.M.'s two issues, we dismiss the appeal.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Delivered: March 4, 2021